—2:21-cv-00659-RFB-EJY—

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

BARBARA HERPOLSHEIMER, as      )
4   Special Administratrix to    )
the Estate of BERT WEAVER,     )  Case No. 2:21-cv-00659-RFB-EJY
5                                )
Plaintiff,    )  Las Vegas, Nevada
6                                )  October 19, 2022
vs.          )
7                                )
MARQUIS COMPANIES I, INC.,      )  MOTION HEARING
8   a Foreign Corporation dba    )
MARQUIS PLAZA REGENCY          )
9   and/or MARQUIS PLAZA         )
REGENCY POST ACUTE REHAB          *C E R T I F I E D   C O P Y*
10  and/or MARQUIS CARE AT        )
PLAZA REGENCY; DIRECT           )
11  SUPPLY, INC., a Foreign       )
Corporation, INVACARE          )
12  CORPORATION, a Foreign        )
Corporation; ROE RETAILER;      )
13  DOES I-X; and ROE             )
CORPORATIONS I-X,              )
14  inclusive,                    )

15                  Defendants.

16  _____

17                    TRANSCRIPT OF PROCEEDINGS

18              THE HONORABLE ELAYNA J. YOUCHAH,
UNITED STATES MAGISTRATE JUDGE
19

20  APPEARANCES:          See Next Page

21  DIGITALLY RECORDED:   Liberty Court Recorder
11:32 a.m.
22
TRANSCRIBED BY:      PATRICIA L. GANCI
23                           (702) 385-0670

24

Proceedings recorded by electronic sound recording, transcript
25  produced by mechanical stenography and computer.

```
                          ─2:21-cv-00659-RFB-EJY─
```

1  APPEARANCES:

2  For the Plaintiff:

3          **STEPHEN MENDENHALL, ESQ.**
          HENNESS AND HAIGHT
4          8972 Spanish Ridge Avenue
          Las Vegas, Nevada 89179
5          (702) 807-4700

6  For Defendant Marquis Companies I, Inc.:

7          **BRITTANY LEWIS, ESQ.**
          MESSNER REEVES, LLP
8          8945 W. Russell Road, Suite 300
          Las Vegas, Nevada 89148
9          (702) 363-5100

10 For Defendants Direct Supply, Inc. and Invacare Corporation:

11         **MARIO D. VALENCIA, ESQ.**
          MARIO D. VALENCIA, ATTORNEY AT LAW, LLC
12         40 S. Stephanie Street, Suite 201
          Henderson, Nevada 89012
13         (702) 384-7494

14

15

16

17

18

19

20

21

22

23

24

25

―2:21-cv-00659-RFB-EJY―

1          LAS VEGAS, NEVADA; WEDNESDAY, OCTOBER 19, 2022; 11:32 A.M.

2                              --oOo--

3                    P R O C E E D I N G S

4          COURTROOM ADMINISTRATOR:  This is the time set in the

5  case of 2:21-cv-659-RFB-EJY, Barbara Herpolsheimer versus

6  Marquis Company I, Inc.

7          Plaintiff's counsel, please enter your appearance for

8  the record.

9          MR. MENDENHALL:  Good morning, Your Honor.  Stephen

10  Mendenhall, Bar Number 15286, appearing on behalf of the

11  plaintiff.

12          THE COURT:  Thank you.

13          COURTROOM ADMINISTRATOR:  Defendants' counsel, please

14  enter your appearance for the record.

15          MS. LEWIS:  Good morning, Your Honor.  My name is

16  Brittany Lewis, Bar Number 14565, representing Defendant Marquis

17  Corporations.

18          THE COURT:  Thank you.  We're in Federal Court.

19  Everyone's -- I don't need your bar numbers.

20          MR. MENDENHALL:  Okay.

21          THE COURT:  Go ahead.

22          MR. VALENCIA:  Thank you so much.  Mario Valencia on

23  behalf of Invacare Corporation and Direct Supply.

24          THE COURT:  Thank you.  Thank you.

25          So I have -- seems like it's echoing a little bit.  I

───────2:21-cv-00659-RFB-EJY───────

1   have been -- I have read the motion, opposition, reply

2   thoroughly.  I don't -- I don't recognize -- I've practiced in

3   Nevada for 26 years before I took the bench.  But I don't

4   recognize anyone, but it doesn't mean I haven't met you before.

5   I do meet a lot of people and have over the years.  But I just

6   tell you that primarily because I was a civil litigator.  To say

7   that I am thoroughly familiar with relevance, proportionality,

8   Rule 30(b)(6) would be an underestimate.  So I don't need any

9   education on those issues.  People who take the bench who have

10  been criminal defense lawyers or prosecutors certainly need a

11  little bit more, just like I did in the criminal proceedings,

12  but those are subject matters with which I am extremely

13  familiar.

14          And I want to point out just a couple of general

15  propositions to help guide you as to where my concerns are.  Of

16  course, you know, it's -- 30(b)(6) is a wonderful, but also

17  challenging rule because while it provides the opportunity, as

18  it should, to depose a corporation, to bind a corporation --

19  because of course a corporation can't speak for itself.  Only

20  people can speak for the corporation -- the topics, unlike when

21  you set a normal dep -- normal -- an ordinary deposition, have

22  to be identified with particularity.  It is not sufficient to

23  simply list things for a 30(b)(6) deposition, but you must

24  provide the subject matters with reasonably specific

25  particularity so that the other side doesn't know necessarily

1  the question that will be asked, of course you don't have to

2  list questions, but does understand the subject matter

3  sufficiently so that when they have -- they fulfill, that is the

4  corporation fulfills its obligation, which is also rather dense

5  for a civil rule of procedure, they do so adequately so they

6  don't get caught in the you-didn't-adequately-prepare allegation

7  and end up with sanctions and costs associated with that.

8         Particularity requires not merely, and I think I said

9  this, topics to be listed, but that the subject matter of those

10 topics be specific enough that they have discernible boundaries,

11 that somebody can understand I am supposed to go out and find

12 someone who either has this knowledge or can be prepared to

13 provide answers to this subject matter.  And that's a concern I

14 have with some, not all, of the topics that are at issue here

15 today.

16        And, of course, things have to be temporally and

17 geographically, to the extent there's a geography issue,

18 specific and reasonably proportional to the needs of the case as

19 well.

20        I -- I have concerns here, as I just said, with -- and

21 I'm going to use Topic -- I think it's Topic Number 1 that is

22 a -- yes, it's -- as a good example here.  But I do know there

23 is an argument about the time frame here.  Plaintiff at one

24 point says, "Well, I'm only looking for one year going back,"

25 but then adds the language that says, "with rare exception for

—2:21-cv-00659-RFB-EJY—

1  topics involving plaintiff's stay."  Seems like all of the

2  topics would involve plaintiff's stay because if it's not about

3  how plaintiff was impacted by things in this case, I'm not sure

4  what the relevance would be necessarily.  So I need to

5  understand that.

6      And then of course we have the argument about

7  subsequent remedial measures.  And with respect to subsequent

8  remedial measures, I never did personal injury law.  I only say

9  that because this is not an area in which I consider myself a

10  true expert.  My review of the case law is that the -- that

11  there must be an actual remedy, a subsequent remedy, that

12  somebody is trying to discover for purposes of establishing

13  negligence or culpability.

14      Preparation for remedy is not a subsequent remedy,

15  according to case law.  I can point you to Aranda versus City of

16  McMinnville -- McMinnville, that's 942 F. Supp.2d 90 -- 1096,

17  1103.  It's a District of Oregon case.  There's a District of

18  Nevada case at 2015 WL 13702110 that says:  "The Court notes

19  that Rule 407 only applies when remedial" -- and this is in

20  quotes -- "measures are taken.  If the topic defendant seeks to

21  exclude does not refer to any remedial measure actually taken,

22  407 does not apply."  So for defendants' purposes, you need to

23  keep that in mind.

24      Looking at Topic Number 1, and I'm going to ask you,

25  Mr. Mendenhall, to think about this with me as we go through it,

1  it states -- let me make sure -- "The following documents

2  produced by Defendant Marquis in this matter, including the

3  authenticity of the documents, the completeness of the

4  production, the method of search for the documents, the document

5  destruction/retention policy, and the identification of all

6  initial signatures and user names which appear on the

7  documents."  And then I realize there are only two subject

8  matters that involve Invacare operator and maintenance manual

9  and Invacare Electric Portable Patient Lift MCPR.  And there are

10 Bates numbers I presume that follow that.

11        When I -- when I look at that subject matter, my

12 question is, what is it defendants are looking for?

13 Authenticity?  That's easy.  Okay.  But you don't set a 30(b)(6)

14 for authenticity.  You set a custodian of record for

15 authenticity because typically 30(b)(6)s aren't the custodians

16 of record, typically, not always.  But in a larger company, such

17 as this one, they won't typically be the same, right.

18        "The completeness of the production."  Well, why --

19 what is that -- is that -- you want to understand what was

20 searched for that resulted in these two manuals?  Is there

21 something -- I'm not asking you to answer these questions.  I'm

22 pointing this out as examples only.  Is it something -- is there

23 some concern that the manuals are incomplete, that there are

24 other manuals?  Was it the search for documents generally?  How

25 was it conducted?  You might want to ask that question generally

─────2:21-cv-00659-RFB-EJY─────

 1   of a 30(b)(6).  How did the corporation go about searching for

 2   responsive documents to, and I will just use this because it's

 3   apropos in this case, to the choice of a Hoyer lift for patients

 4   who are incapable of mobilizing themselves using mobile -- you

 5   know, tools to mobilize?

 6        So you could do that, but I -- "the completeness of the

 7   production," I just didn't really know what you wanted.  And I'm

 8   not suggesting again that plaintiff would have to say, "Here's

 9   my question that I'm going to want you to answer."  But I

10   understood from defendants' perspective what is it that you

11   wanted people to respond to.  And I'm going to go to Topic 2 for

12   that again because this one was in my estimation even worse.

13        It says, "Topic 2 in particular," because I know in the

14   moving papers 2, 16, 17, and 18 are grouped together.  I know

15   plaintiff grouped them slightly differently.  "Marquis records

16   involving Mr. Bert Weaver, including the medical and billing

17   records from Marquis Care at Plaza" Century -- sorry -- "Plaza

18   Regency pertaining to Bert Weaver produced by Defendant Marquis

19   in its initial disclosure including the following:  the Weaver

20   profile, Weaver admission documents, Weaver medical diagnoses."

21        I have absolutely no idea what you want.  Are you

22   looking for, again, authentication?  Completeness?  The

23   contents?  How the company goes about gathering a profile?  Who

24   is in charge of creating a profile?  What information do they

25   seek?  Why do they seek it?  Why don't they seek something else?

—2:21-cv-00659-RFB-EJY—

1          With an admissions document, I don't know what's on an

2     admissions document.  I have been around the block a few times.

3     I can imagine what's on an admissions document, but I don't

4     understand what it is plaintiff is seeking about them.

5          And then when you say in your opposition:  "Plaintiff

6     must be afforded an opportunity to depose a corporate designee

7     regarding Defendant Marquis' familiarity, reliance, and use of

8     the content and instructions" or whatever it is -- I'm probably

9     reading -- that's the first one where it says use of the -- I'm

10    sorry.  I mixed 1 and 2 together here.

11         But -- or, yeah, Request Number 1 and 2.  The problem

12    is your explanation isn't what your 30(b)(6) says and your

13    opposition isn't a 30(b)(6) notice.

14         So these are concerns I have, and I'll let you argue.

15    I really do not know -- I think there's some in Topic 2 that

16    might be relevant and proportional to the needs of the case, but

17    based on how it's worded I do not know.

18         And things like -- I think you have on here medical

19    diagnosis.  Well, a corporate representative is going to be able

20    to read a medical diagnosis to you.  "Yes, it says he was in

21    Stage 4 renal failure.  He was in Stage 5 renal failure."  But

22    unless that person's a doctor, they're not going to be able to

23    tell you why that conclusion was made, how it was made, how it

24    should have impacted his care, if at all, how that relates to

25    the fall, not clear to me how they relate to one another.  So

2:21-cv-00659-RFB-EJY

1  that's a problem with relevance and proportionality.

2        But even assuming you wanted that information, I'm not

3  sure I understand how a corporate representative would give it

4  to you or what it is that you're seeking.

5        Care plans, reviews, I don't know what the reviews are.

6  Perhaps, it's a specific thing that Marquis does.  Those are --

7  those are the kinds of concerns that the Court has.  And I can

8  go on, but -- and I can tell you which -- which topics I thought

9  were sufficiently -- that don't need to be addressed, and then

10 I'll let you address the rest.  I only have one more question

11 before I let you talk.  I know I've done a lot of talking here.

12 I always do a lot of talking at the beginning of motions.  So

13 you'll figure that out about me.

14        11, 12, and -- oh, sorry.  11, 15, and 22 seemed to me

15 to be sufficient.  So I would ask defendants when we get to you

16 to address those.

17        21, I wanted to address.  It is -- there's nothing

18 HIPAA about this.  Finding out what incidents occurred, that

19 doesn't require the disclosure of medical information.  That

20 somebody fell is not medical information.  There's no HIPAA

21 issue that somebody was -- that a Hoyer lift broke and dropped a

22 patient is not medical information.  It is an event.  It is a

23 fact.  So that is not covered by HIPAA.

24        And so that was not a good objection as far as I'm

25 concerned.  And, clearly, complaints regarding resident care and

—2:21-cv-00659-RFB-EJY—

1   safety I think that that is also reasonable.  I have some

2   concern about the length of time preceding the event at issue

3   since something going back to 2016, I believe this occurred in

4   '18, didn't seem relevant to me, but there is a period of time.

5          And then with 24 and 25, I do not know what the council

6   is.  There's a reference to council, council and board meeting

7   minutes, you can -- both need to address these because I do not

8   know what the council is, as I said.  And I'm not clear on how

9   these would necessarily help -- council meeting minutes would

10  necessarily relate to the Hoyer lift.  So that's -- those are

11  some questions I have.

12         A lot of introduction, Mr. Mendenhall.  Sorry.  I'm

13  happy to answer any questions you might have about what I've

14  said, but let me ask you to first respond, sort of, to my

15  concerns about how these topics and all of them that I didn't

16  mention are ones with which I have a problem.  They are all too

17  vague, too broad, too general, and I'm suggesting that you talk

18  to me about how you might be able to restate them in a way that

19  would allow somebody to prepare.

20         MR. MENDENHALL:  Thank you, Your Honor.  I'll begin by

21  addressing Topics Number 1 and 2 because that seems to be of

22  great concern for you.

23         And I appreciate your recognition that these are

24  difficult sometimes to write out as we're not obligated to write

25  the questions beforehand, merely the topics that we're expecting

————2:21-cv-00659-RFB-EJY————

1    to address with the sufficient particularity as you mentioned.

2           Beginning with Number 1, there were -- as you see in

3    the initial notice, there was a litany of documents that were

4    listed there.  And Defendant Marquis' only objection was to the

5    two documents involving Invacare owner/operator manual and

6    electric portable patient lift.  My understanding that their

7    primary argument against those is that those were not documents

8    that they themselves produced.

9           And I understand counsel's argument and Your Honor

10   pointed it out that it's difficult for them if it's not their

11   document to speak to the authenticity.  However, I will tell you

12   that these documents -- and you're well aware of the facts of

13   this case.

14          THE COURT:  I read it.  I wasn't before.  But I

15   understand what happened.

16          MR. MENDENHALL:  Okay.  So the documents at issue for

17   Topic Number 1 concern manuals that were provided to Defendant

18   Marquis by Defendant Invacare presumably at the time that they

19   purchased the subject Hoyer lift and the subject Hoyer lift

20   slings, which I believe was back in 2016.

21          Now, what I would like to do with the 30(b)(6)

22   deponent, Your Honor, is to be able to explore the -- primarily

23   for those two particular documents, the retention policy for

24   those documents and how those documents were implemented within

25   the policies and procedures at Marquis.  Those documents contain

─2:21-cv-00659-RFB-EJY─

1   a plethora of instructions for the care, use, retention,

2   destruction of the machine and the slings.

3          Discovery conducted thus far has not solidified where

4   those policies and procedures were -- I'm sorry -- where those

5   owner/operator manual -- owner/operator manuals were stored,

6   whether or not they were used, to what extent they were used, to

7   what extent they were implemented in the policies and

8   procedures.

9          So my primary focus -- and I -- and I appreciate that.

10  I tried to, you know, not have 70 topics.  So including that was

11  part of the documents that Marquis had produced.  And Marquis

12  did produce those Invacare manuals as part of their own

13  production.  I do understand that they did not create those

14  documents -- documents themselves.

15         So ideally, Your Honor, I could parse out those two

16  documents and create a second topic, which spoke specifically to

17  that --

18         THE COURT:  I know.  Mr. Mendenhall, you need to

19  restate the topic.  You do not state in this topic where --

20  where -- how these were stored, electronically, who had access

21  to them, who was trained on them, how was it implemented, when

22  was it implemented.  You haven't said any of that in this topic.

23  I did not have any idea that that's what you were looking for.

24         And I think that --

25         MR. MENDENHALL:  Okay.

1        THE COURT:  -- when you get to some training topics

2   below, you -- although, again, a little overbroad, you -- it's

3   clearer now that that's what you're looking for.  But this

4   doesn't say that.  That's the problem.

5        MR. MENDENHALL:  Understood.

6        THE COURT:  That's the real problem.  Maybe if the

7   subject matter was how were the instructions in the manuals

8   implemented by Regency at -- I'm sorry -- Regency, you know.

9   That's the problem with Number 1.

10        MR. MENDENHALL:  Understood, Your Honor.  And that is

11   something that I think could be easily cured --

12        THE COURT:  Uh-hmm.

13        MR. MENDENHALL:  -- pursuant to your ruling here today

14   and counsel.

15        To address Number 2, Your Honor, probably similar to

16   Number 1, needing -- needing additional language.  There again,

17   it's difficult to curate a topic without giving up the questions

18   in advance.  The documents listed under Number 2, these are

19   documents concerning Mr. Weaver himself.  As you're aware

20   plaintiff has causes of action for negligence, negligent hiring,

21   training, and supervision, negligent care of a vulnerable

22   person.  So, for instance -- and, again, we don't need to

23   belabor the point because I think your response would be similar

24   to Number 1.

25        When we talk about Mr. Weaver's care plans in

—2:21-cv-00659-RFB-EJY—

1 conjunction with his diagnoses at the time of entrance, I would

2 like to explore topics with the corporate designee to understand

3 what decisions were made pursuant to the diagnoses and

4 comorbidities that Mr. Weaver had and how those were implemented

5 in his care plan.

6        We also see from the care plans that have been produced

7 that those care plans kind of changed over time depending on

8 Mr. Weaver's condition, new diagnoses that were introduced.

9 Certainly he had these comorbidities.  He was already an amputee

10 that required these transfers.  The transfers themselves, what

11 was required, changed over time.

12        Understanding that the medical records -- these are not

13 doctors who are going to be able to speak to more than just "I

14 understand that he was diagnosed with renal failure" or whatever

15 that comorbidity might be.  But I do think that a corporate

16 designee should be able to testify as to how that impacted the

17 level of care that Mr. Weaver was ultimately assigned or

18 received during his time as a resident at the Marquis facility.

19        THE COURT:  Well, but wouldn't -- I don't know if

20 Marquis had this, but wouldn't that -- you know what, I think of

21 a corporate designee as going to be, you know, the chief

22 administrative officer, the president, the -- whoever it is, the

23 functioning entity here, not of the whole corporation.

24        And typically the -- just like in hospitals, the

25 administrative part of running a hospital, a care facility,

———2:21-cv-00659-RFB-EJY———

1    whatever it is, and the medical side are separate.

2            And the chief of medicine, the chief nurse, the -- you

3    know, the chief nursing officer, the CNO, the -- you know, the

4    chief -- chief of surgery, the chief of nephrology, whatever it

5    is, right, is going to be a healthcare provider, not an

6    administrator.  Sometimes they're not employed by the hospital,

7    right.  So there's not going to be a corporate representative.

8            So I just am not sure how with respect to diagnoses or

9    care plans, I'll ask the defendants to respond to this, who it

10   is, that they would have somebody who would be able to speak to

11   the implementation.  Now, if they have a chief nursing officer

12   who overseas all of the plans, maybe that's the person.

13           But it wouldn't be the same person, obviously, as

14   somebody who's going to tell you why they selected the Hoyer

15   lift, right.  Those are going to be -- you know, that's going to

16   be a business decision, right, or staffing levels is going to be

17   a business decision.

18           So we need enough specificity so if they have to bring

19   two or three people, that's their obligation as long it's

20   relevant and proportional to the needs of the case.

21           That's my concern.  I'm not sure I understand how --

22   I'm not sure I understand how the care plans, diagnosis, weight,

23   vitals, what -- what a -- as opposed to the -- what a 30(b)(6)

24   as opposed to the nursing staff because it was probably -- you

25   know, nursing's all about healthcare.  Doctors do very little,

─────2:21-cv-00659-RFB-EJY─────

1   right.  They come in.  They look at you.  They say the

2   diagnosis, here's what's doing.  They're out of there.  And then

3   the nurses are in charge, right.  Same thing in hospitals.

4           So ...

5           MR. MENDENHALL:  Your Honor, if I may --

6           THE COURT:  ... I just think it's --

7           MR. MENDENHALL:  Oh, I'm sorry.

8           THE COURT:  -- going to be a different kind of person,

9   and you're going to need to be more specific so they know who to

10  bring.

11          MR. MENDENHALL:  I could definitely try and be more

12  specific.  I think one of the issues we're dealing with in the

13  complexity of this case is we do have a mixture of the medical

14  side of things and a nursing home facility.  The type of sling

15  that was selected comes down to, you know, height, weight, size,

16  everything like that.  And those were being selected by CNAs who

17  weren't necessarily trained properly on how to select those,

18  right.  And so there is an overlap, I think, of the medical

19  records versus the care plan and what was being implemented and

20  how that was being discussed and instructed to the CNAs on how

21  to transfer Mr. Weaver where he was ultimately injured.

22          I certainly understand your concerns about the

23  specificity, and I am going to cure that.  But I think that

24  these records are vital for plaintiff to be able to explore as a

25  nursing home facility presumably -- when I've done these before,

---2:21-cv-00659-RFB-EJY---

1  it's typical an executive director or something like that that's

2  going to be produced as a 30(b)(6) witness, as least for the

3  topics involving the care plan and those types of things.  And,

4  Your Honor, I feel like we need to explore those.

5          If I may jump down to Number 18, which I did parse out,

6  those are multidisciplinary care conferences.  And this is just

7  to show you an example of why these --

8          THE COURT:  In the facility?

9          MR. MENDENHALL:  In the facility.

10         THE COURT:  It's not like a -- I didn't know.

11         MR. MENDENHALL:  No.  Yeah.

12         THE COURT:  It's not community council.  It's --

13         MR. MENDENHALL:  These are conducted by the LPN and the

14  staff that takes care of the residents.

15         THE COURT:  Okay.

16         MR. MENDENHALL:  They're done on a quarterly basis.

17         This is a good example, Your Honor.  Defendant Marquis'

18  rebuttal to all of this primarily has been, "Well, we produced

19  these records.  They speak for themselves.  Why do you need

20  someone to come in?"

21         We have a multidisciplinary care conference eight

22  months prior to the actual fall where Mr. Weaver complained that

23  the transfers involving Hoyer lifts with new CNAs do not go

24  well, right.  And we've discussed that with certain deponents,

25  and their response has been, "Well, we marked it down here.  I

———2:21-cv-00659-RFB-EJY———

1   know we didn't write down that any follow-up was done, but it's

2   our -- it's our habit and practice to follow-up so we must have,

3   right."

4          I think I should have an opportunity to sit down

5   someone who can speak to the -- and this is part of the records

6   involving Mr. Weaver, part of his profile --

7          THE COURT:  Uh-hmm.

8          MR. MENDENHALL:  -- to determine, you know, whether or

9   not something was done.  And if it wasn't -- because if I don't

10  have that opportunity and we go in front of the jury, and in my

11  case-in-chief I should have the opportunity to tell the jury,

12  "We deposed a corporate representative who said that we can

13  presume nothing was done if it wasn't written down," something

14  along those lines.

15         Where the alternative, Your Honor, I can't go in front

16  of the jury and say, "I never had an opportunity to explore

17  this.  You're going to have to take the word of the -- of the

18  nurse that came in and said, 'Well, I always did something, even

19  if I didn't write it down.'"  Right.  I have to be able to

20  explore those topics with the 30(b)(6).  And that's fine -- and

21  understanding that I might need more specificity, but these

22  records involving Mr. Weaver and his care all go into our causes

23  of action.  And there is a lot of complex overlap with the

24  ultimate injury that occurred, the incident that occurred

25  involving the Hoyer lift.

————2:21-cv-00659-RFB-EJY————

1          THE COURT:  I don't -- I don't disagree.  I think
2    medical care often overlaps, right.  The administrative or
3    business side of medicine and the medical side of medicine, they
4    don't get along very well frequently.  And increasingly insurers
5    stick their noses in that and make it that much more difficult.
6    So I understand all of that.
7          And I think your point is well taken.  I don't argue
8    with you.  I think that's not what this says.  That's the
9    problem.
10         MR. MENDENHALL:  Okay.
11         THE COURT:  So, you know, if you want to understand the
12   facility here in Las Vegas, its procedure for implementing
13   changes following a client's complaint about a Hoyer lift, then
14   I think that's reasonable.  And whether they bring a corporate
15   representative or a CNO or somebody else as the corporate
16   representative -- I shouldn't say whether they bring a corporate
17   representative.  What I mean is whether they bring an executive
18   director who's really in charge of the business side or somebody
19   like a CNO as the corporate representative who answers that
20   question and says, "Yes, it's our policy to write it down.  Yes,
21   that's what we should do.  No, that didn't happen here."
22         "Does that mean it didn't happen here?"
23         "No."
24         Whatever they say, right.  You should have that
25   opportunity, but that's not what this says.

—2:21-cv-00659-RFB-EJY—

1          MR. MENDENHALL:  Understood, Your Honor.

2          THE COURT:  That's the problem, not the subject, what

3   it says.

4          MR. MENDENHALL:  Understood.  Yes, and absolutely those

5   are issues that I think I can cure.

6          THE COURT:  Okay.

7          MR. MENDENHALL:  And work with Defense counsel to cure.

8          THE COURT:  All right.  I think that's really what --

9   what you need to do for 1, 2, 16, 17, 18, 3 ... I'm just going

10  to look at these training once again.  So we have -- yeah, for

11  all of those that I just said.

12         Then with respect to the training materials, so I'm

13  looking at Number 5, "All training materials, programs,

14  instructions offered and/or provided to employees and

15  personal -- personnel members of Defendant Marquis' facility

16  regarding the care for patients at the facility."

17         So my concern here is concerning "care" -- regarding

18  "care for patients at the facility."  That phrase to me in

19  particular was overbroad, right, because the care could be how

20  we clean the floor, how often we change bed lidens -- linens,

21  excuse me, the kind of food we choose for our renal failure

22  patients, right.  And those are not at issue.  So I think that

23  the problem with 5 is its overbreadth with respect to regarding

24  the care for patients.  That language was overbroad.  Whereas,

25  the next one says, "All training regarding Hoyer lift/Hoyer

─────2:21-cv-00659-RFB-EJY─────

1  slings."  That, I think is where you're headed.

2       Now, I don't know if there's something more than that

3  you want the training on, but the first one is just too broad.

4       MR. MENDENHALL:  Okay.

5       THE COURT:  So 5 needs to be narrowed.

6       6, tell me why going back to October 2016 is an

7  appropriate time limit.

8       MR. MENDENHALL:  Your Honor, I tried to -- I tried to

9  limit those.  And some I tried to go six months or a year before

10 the incident, and some I thought it was appropriate to go back

11 to the actual date that Mr. Weaver was admitted to the facility,

12 which is that October 4th date.

13      THE COURT:  Okay.

14      MR. MENDENHALL:  So any time you see that October 4th

15 date I felt like it was more appropriate.  For instance, on

16 Number 6, when we talk about the use of Hoyer lifts and Hoyer

17 lift slings, we have materials already through discovery that

18 indicate that these transfers weren't going all that well even

19 prior to the date that he fell in February of 2018.  So I think

20 being able to understand what training was going on for these

21 employees with the specific use of those slings and the other

22 thing -- or with the Hoyer lifts.

23      The other thing that we have an issue with, Your Honor,

24 is at the very heart of this matter is this Hoyer lift sling

25 which allegedly broke.  It's gone, so we don't have that to

—2:21-cv-00659-RFB-EJY—

1   review.  But there are very specific instructions --

2   instructions on the care, laundering, the use of them, when

3   you're supposed to throw them out, those things.

4        And so being able to explore from October 4th to the

5   February 7th is a year after, and I'll get to that in a second,

6   would allow us to understand what training was being implemented

7   in the care of these slings.

8        So it wasn't in our position, Your Honor, something

9   where something just was brand new and broke all of a sudden.

10  This is something that we believe was building over the course

11  of many, many months, even a couple of years, over the use and

12  care of these slings that ultimately resulted in Mr. Weaver's

13  fall.

14       And the reason, Your Honor, just so I can address it,

15  that we went one year after the fall is certain discovery

16  conducted thus far has indicated that Marquis after the fact

17  went through and audited the slings that they still had at the

18  facility and threw many of those away.

19       No one has been able to really speak thus far to the

20  specifics of that auditing process, why certain ones were chosen

21  to be thrown away, whether any were kept at the facility and

22  continued to be used.  And so the reason on any of the slings

23  that I go after the date is to try and find someone that can

24  speak to that auditing process and whether or not any changes

25  were implemented in how those slings were going to be laundered

—2:21-cv-00659-RFB-EJY—

1 | and taken care of moving forward.

2 |         And I will say, Your Honor, I understand that

3 | subsequent remedial measures and everything that you addressed

4 | before.  Again, as I'm sure you've heard from other plaintiff's

5 | attorneys, discoverability and admissibility --

6 |         THE COURT:  Of course.

7 |         MR. MENDENHALL:  -- right, are very different.

8 | Certainly if we're able to ask those questions and nothing comes

9 | up, I'm not standing here today asking for this information to

10 | be admissible.  But I do think that I have a right to ask the

11 | question to see what changes were made.

12 |         THE COURT:  All right.

13 |         MR. MENDENHALL:  Sorry.  I get longwinded as well.

14 |         THE COURT:  You are not longwinded.  You are just fine,

15 | sir.  And the information is helpful.

16 |         Okay.  So then with -- so, in essence, is, you know, 6,

17 | 8, and 10 all seem -- maybe 11, which I said was okay already,

18 | these were all interrelated subject matters.  I get the October

19 | 4th date.  I'll ask defendants to respond to that.  I'll ask

20 | them to respond to the subsequent remedial measure issue as to

21 | the going forward time period.  And I think, otherwise, those

22 | subject matters are okay.

23 |         How about Number 20?  Tell me -- this is a relevance

24 | and proportionality question for me -- how many new Hoyer slings

25 | were ordered, quality, type, size.  16 is -- May of '16 is six

———2:21-cv-00659-RFB-EJY———

1   months before Mr. Weaver was admitted, now that I know that it's

2   October, now that it's stuck in my head.  It's a little less

3   than six months through the -- through a subsequent time period.

4   Why is that -- why is that relevant and proportional to the

5   needs?

6          MR. MENDENHALL:  Yes, Your Honor.  And that probably

7   seems a little bit more overbearing than it actually is.

8   Defendant's counsel has produced a single invoice where they

9   ordered Hoyer lift slings and machines to be used.  My intention

10  on this particular topic, Your Honor, is to have a corporate

11  designee testify and confirm that no additional slings were

12  ordered between the time period of the ones for the invoice that

13  we have and the actual incident that occurred.

14         It's not a situation where they're -- they are ordering

15  new slings every month or every couple of months, anything like

16  that.  They've represented to us that that's the only invoice.

17  And, again, Your Honor, to go back, this is a matter of how many

18  slings did they have at the facility, how often were they being

19  used, how often were they being laundered.  If they were

20  ordering new ones, right, I'd like to know that, or if they were

21  using that same bundle from the invoice that we have.

22         So that topic, as written, I understand why that

23  appears to be burdensome.  In actuality, it would probably be a

24  couple of questions.  Can you confirm that the invoice we've

25  received and the slings are the only, you know, slings that

—2:21-cv-00659-RFB-EJY—

1  Marquis ordered to their facility for that time period between

2  the invoice and when the incident occurred?

3          THE COURT:  Okay.  So it just sounds like Number --

4          MR. MENDENHALL:  Not to tip my hand too much to

5  Ms. Lewis.

6          THE COURT:  -- 20, yeah, 20 just needs to be reworded

7  then about, you know, the person most knowledgeable regarding

8  the ordering of slings between these two dates as stated on the

9  invoice, right?

10          MR. MENDENHALL:  Okay.  I can do that.  And I

11  appreciate, Your Honor -- I don't like writing "each and every,"

12  right, as that one starts, but, again, I --

13          THE COURT:  And "all."  These are scary words.

14          MR. MENDENHALL:  -- I would like to confirm -- yeah.

15  But, again, I would like to confirm whether any additional

16  slings were ordered in that time period.

17          THE COURT:  Okay.

18          MR. MENDENHALL:  And if they were, Your Honor, to be

19  fair, I would like to explore certainly when those were ordered,

20  you know, implemented into the rotation, those types of things.

21  But I can -- I can cure that language to be more specific --

22          THE COURT:  And I think that's again --

23          MR. MENDENHALL:  -- to my intentions.

24          THE COURT:  That's -- that's the need here.

25          MR. MENDENHALL:  No problem.

1          THE COURT:  14, the dates and hours of the two

2    employees.  I understand why it would be relevant and

3    proportionate to the needs of the case with respect to the time

4    period prior to the fall -- to the week prior to the fall and

5    there -- at the facility.  And I understand why you would want

6    to know whether they were working elsewhere, but hasn't the

7    company told you they don't know?  And have they done that in a

8    way that is -- like, have they done it in an interrogatory where

9    they've signed a verification?

10          MR. MENDENHALL:  I would probably have to defer to

11    Ms. Lewis on that.  I'm not sure if we have an interrogatory on

12    that.  I would have to double-check, Your Honor.

13          I think that counsel for defendant has represented that

14    they don't know.  However, to the extent that that violates

15    their own policies and procedures, I would still like to be able

16    to obtain that concession from a corporate designee.

17          THE COURT:  But you don't ask about the policies and

18    procedures.  That's not what it says.

19          MR. MENDENHALL:  I --

20          THE COURT:  It just asks for the schedule.

21          MR. MENDENHALL:  Understood.  Yeah, and I realize I

22    addressed that in my opposition.  Again --

23          THE COURT:  This is why --

24          MR. MENDENHALL:  -- that's the balance of trying not to

25    tip too much of my hand by providing the specific questions I'm

─2:21-cv-00659-RFB-EJY─

1  going to ask, but also meeting the specificity requirement.  I

2  can certainly include that.  To the extent that they could know

3  what additional employment they had, though, I would still

4  expect a corporate designee to at least make an effort.

5          THE COURT:  Do those two people still work for the

6  facility?

7          MR. MENDENHALL:  One does, Your Honor.

8          THE COURT:  Yeah.  Well, I don't know how they would

9  get it for the other if they didn't keep it.

10         MR. MENDENHALL:  Okay.

11         THE COURT:  And if -- you know, you can't testify to

12  what you don't have.  This has come up many times.  You can say,

13  "Do you have any information" -- I'll just pick one of them --

14  "Augustine Ackom's employment outside of your employment?"

15         "No."

16         "You don't know what hours she worked other than what

17  she was scheduled for at the facility?"

18         "No."

19         There's nothing else.  They don't have to go find her

20  and ask.

21         MR. MENDENHALL:  Sure.  And in follow-up to that, Your

22  Honor, those I would ask, "Do you agree that that's a violation

23  of your policies and procedures to not know the hours that your

24  employees are working outside of" --

25         THE COURT:  Not based on this topic.

2:21-cv-00659-RFB-EJY

1           MR. MENDENHALL:  I can cure that, obviously.

2           THE COURT:  If I were sitting in the defense --

3           MR. MENDENHALL:  But I agree with you --

4           THE COURT:  -- shoes --

5           MR. MENDENHALL:  -- because going back to the

6  case-in-chief, right, that's something that I would like to have

7  nailed down before --

8           THE COURT:  But that's again why you have to word them

9  in such a way that you don't elicit the outside the scope of the

10 topic.

11          MR. MENDENHALL:  Sure.

12          THE COURT:  Right.  Because if I'm sitting in

13 defense -- defendant's shoes -- I can sit in your shoes and say,

14 "Sure, that's a reasonable question."  And I'm sitting in

15 defense shoes and say, "That's not what your topic says, not

16 even close to anything."  I can't even reasonably infer that

17 that's what you want from this topic.

18          So should I know it intuitively?  Maybe, but that's not

19 how 30(b)(6) works.  That's the problem --

20          MR. MENDENHALL:  Well --

21          THE COURT:  -- so ...

22          MR. MENDENHALL:  -- I guess my question, Your Honor, is

23 going to -- you know, using that in conjunction with one of the

24 other topics that does talk about policies and procedures and

25 having a corporate designee.  I don't know if -- if you're

———2:21-cv-00659-RFB-EJY———

1  telling me that I should, I can, but by putting in Number 14,

2  right, that's notifying the defendant that I would like to ask

3  about the employment outside of Marquis for just -- just for

4  that week, right.  Shouldn't it also -- not also work in

5  conjunction with the policies and procedures stating that

6  employees need to notify their employer of all -- of all

7  employment that they have?

8          THE COURT:  Did I miss that as a topic?  I see 15 --

9          MR. MENDENHALL:  Well, you know, it's probably one of

10  those that I need to cure and make more specific, Your Honor,

11  but I'm just asking, can --

12          THE COURT:  Yes.

13          MR. MENDENHALL:  -- for the specificity requirements --

14          THE COURT:  You can -- I think you can bundle topics --

15          MR. MENDENHALL:  Okay.

16          THE COURT:  -- is what you're saying.

17          MR. MENDENHALL:  Yes.

18          THE COURT:  But I don't think 15 and 16, which talk

19  about policies, talk about employment policies.  They talk --

20  because there is.  It's patient census.  It's staffing ratios.

21  I get why that's appropriate.  It's guidelines related to

22  complaints, preservation of evidence.  That's reasonable.  But

23  it -- neither of those things, if I were sitting in defendant's

24  shoes, would alert me to employment, outside employment

25  policies.

1          MR. MENDENHALL:  I can -- I certainly can cure that to

2  make it more specific, Your Honor.

3          THE COURT:  I think that's overall what needs to happen

4  here with all of the topics with the -- I mean, 11, 12, and --

5  I'm sorry.  I keep saying 12.  11, 15, and 22 are fine as

6  stated, but if you want them to state something more or

7  different, then it's up to you to -- to do that.  They do not

8  reach employment policies or outside employment.

9          And I do not believe that listing employment policies,

10  for example, would be telegraphing the particular question.

11          MR. MENDENHALL:  Okay.  Understood, Your Honor.

12          THE COURT:  All right.  And then tell me -- all right.

13  So then the last couple of things are 23, which I didn't

14  address.  Now I know why the October 4, '16, date is present.

15  Why would subsequent -- not present.  Is the date you chose.  So

16  I understand that.

17          Why would events after be relevant or proportional?

18  So, Number 23, Resident and employee complaints concerning

19  resident care and safety.  Why would it -- why would anything

20  after the fall or after his -- the event for which you are suing

21  be at issue?

22          MR. MENDENHALL:  Yes, Your Honor.  And I feel like I

23  have egg on my face because I keep saying the same thing over

24  and over with specificity.  One of the issues that we have in

25  this case is that Defense counsels have cross-claims against

─────2:21-cv-00659-RFB-EJY─────

1   each other, whether or not this was a negligent maintenance case

2   or whether or not this was a product liability case.

3          THE COURT:  Okay.

4          MR. MENDENHALL:  Thus far, we've had representations

5   that this particular incident was the only one of its kind at

6   the Marquis facility.  Shortly thereafter they did do that audit

7   of the slings and presumably haven't had any incidents akin

8   since.

9          The purpose of that topic, Your Honor, Number 23, for

10  the subsequent is to -- is to determine whether or not there

11  were any identical or similar incidents that occurred.  As a

12  plaintiff I have a duty to file both product liability and

13  general negligence claims to determine what actually happened.

14         Whether or not there were subsequent incidents that

15  happened or this was a one-off with this one sling might give us

16  a better understanding as to whether or not this is a repetitive

17  issue with these slings moving forward which would lean more

18  towards product liability, or if it was a one-off, they threw

19  them all away, got new ones, then in which case it would

20  probably lean towards general negligence.

21         Again, I understand the specificity of that and can add

22  rather than care and safety something more specific to incidents

23  similar to or akin to the incident that occurred to Mr. Weaver.

24         THE COURT:  All right.  And I will let defendant

25  respond to 23 also.  I'm not making any ruling regarding that.

—2:21-cv-00659-RFB-EJY—

1          And 24 and 25, now that I know that it's the

2    interdisciplinary council and I didn't connect it to the earlier

3    issues --

4          MR. MENDENHALL:  That's actually, separate, Your Honor.

5          THE COURT:  Oh, that is a different council?

6          MR. MENDENHALL:  If I may.  Multidisciplinary care

7    councils are councils that occur roughly quarterly at Marquis'

8    facility where individuals that are in charge of taking care of

9    the resident will come in and meet.  It's the resident's

10    opportunity to address -- for them to address concerns, anything

11    that might be going on.

12          Council and board meeting minutes -- and Ms. Lewis

13    might be better suited to speak on this.  She works more in this

14    field than I do in this particular area.

15          It is my understanding that after incidents like this

16    occur at nursing home facilities, skilled nursing facilities,

17    and akin, the leadership at these facilities are going to gather

18    to create essentially a plan of correction, a plan of action.

19    These are often referred to as council and board meeting minutes

20    where they will come together, do -- do kind of a root/cause

21    analysis, kind of the buzz words that come out of these, and

22    determine how to correct the issue moving forward so that it

23    doesn't happen again.

24          So those council and board meeting minutes are separate

25    from the multidisciplinary care councils.  These, it's my

—2:21-cv-00659-RFB-EJY—

1  understanding, are meetings that occur in response -- that are

2  probably routine meetings, but at these meetings they will

3  address any incidents that occurred at the facility between when

4  that meeting is taking place and the preceding meeting,

5  something along those lines.

6       THE COURT:  So are the time frames here a little broad?

7  August 7, 2017, that's the incident date, correct?

8       MR. MENDENHALL:  That's one year before the incident

9  date, Your Honor.

10      THE COURT:  That's one year before, right.  It was '18.

11  Sorry.

12      So, I see.  So what you want to know -- what you're

13  explaining to me, rather, is that if there were a prior event,

14  there would have been one of these meetings and the board

15  minutes would reflect some action plan, typically, or response

16  plan, better said, regarding that prior incident.  And then

17  subsequent, again, goes to the product liability issue.

18      MR. MENDENHALL:  Yes, Your Honor.

19      THE COURT:  Or -- all right.  So just to -- and I'm

20  going to let defendants each speak.  Just to reiterate, however,

21  Mr. Mendenhall, with respect to Topics 1, 2, 16, 17, 18, these

22  are the order in which they were presented in the motion.  So I

23  apologize for them being out of sequential order.  3, 5, and

24  those as well as 20, 14, 10 will all be revised to be more

25  specific or to -- yes, to be more specific to lay out greater

———2:21-cv-00659-RFB-EJY———

1  specificity.

2          MR. MENDENHALL:  I'll add 23 to that as well, Your

3  Honor.

4          THE COURT:  And 23.  Thank you.

5          MR. MENDENHALL:  Yes, that is my understanding and I

6  have that listed.

7          THE COURT:  And then 11, 15, 22 were okay as drafted,

8  but didn't cover some of the subject matters that you wanted.

9  We still need to talk about 6, 8, 9, and 24 and 25.  But you can

10 respond, counsel, to all of them.  I have been known to change

11 my mind more than once in my life.

12         MS. LEWIS:  Thank you, Your Honor.  I think I've got

13 all of my notes, but I was trying to contemporaneously --

14         THE COURT:  Yes.

15         MS. LEWIS:  Go for it.  Okay.  So let's start with 1.

16 We don't -- there's a laundry list of documents that Marquis

17 produced.  We have absolutely no problem talking about

18 authenticity and completeness of those records that we created,

19 we maintained at the facility.  We don't have an issue with

20 that.

21         As it relates to Invacare's operation manual and

22 electric portable lift information, those -- the reason we

23 objected to those specific was we don't know the authenticity or

24 completeness.  It's just what we received from Invacare.

25         And so as it relates as plaintiff's counsel had

———2:21-cv-00659-RFB-EJY———

1  mentioned regarding training, those aspects of things, I think

2  they're covered in other questions related to that.  The issue

3  with this one was related to how the initial wording was

4  regarding authenticity and completeness.  So that's why that

5  objection was in there --

6      THE COURT:  I understand that.

7      MS. LEWIS:  Okay.  So that one --

8      THE COURT:  And let me just say, you can authenticate

9  them to the extent that, "This is what we received.  This is

10  everything we received.  This has not been altered."  And that's

11  how you can -- that's the best you can do.  You can't do more.

12  That's fine.

13      But if those are asked, you can certainly answer those

14  to the best of the facility's ability to do so.

15      MS. LEWIS:  And in our estimation and why part of the

16  objection and discussion was had with plaintiff's counsel is

17  when we produced them in written discovery, that was the

18  representation we were making was this is what we have in its --

19  in its completeness.

20      THE COURT:  Well, but a request for production doesn't

21  bind a company.  If it were an interrogatory, it would if it was

22  signed by a corporate representative, obviously, which it would

23  be.  So that's maybe why he wants to ask the question.

24      I understand "I gave you everything I had."  But it's a

25  reasonable question just so as long as that's the extent.  With

—2:21-cv-00659-RFB-EJY—

1   respect to training and implementation, Mr. Mendenhall is going

2   to have to amend the notice in order to get those questions

3   answered because there's no question to that effect now.

4        MS. LEWIS:  Understandable, Your Honor.  That was -- we

5   were just looking for clarity on that.

6        As it relates to 2 --

7        THE COURT:  Uh-hmm.

8        MS. LEWIS:  -- I think the Court has covered most of

9   our concerns regarding it.  We're talking about a corporate

10  designee.  They're not practicing medicine.  And as it's worded,

11  this is confusing to try to prepare an individual or several,

12  even, individuals to discuss this without crossing over into any

13  sort of corporate medical judgment.

14       The administrators are not going to be providing care

15  to -- to Mr. Weaver.  These questions, a lot of them, would have

16  been more appropriately addressed to a nurse, a physician, a

17  CNA, or whoever was actually providing the care and identified

18  within the records rather than a corporate designee.  A

19  corporate designee could discuss these in a general sense as to

20  how they are created such as the profile, how a profile in

21  general is created.  But as to Mr. Weaver's profile, that goes

22  into many physicians and nurses coming together to create these,

23  which is what is addressed in the multidisciplinary team

24  meetings and the initial meetings which I think are -- as this

25  is worded, seems maybe either redundant or overbroad in relation

1  to those.

2          THE COURT:  Well, and to that extent, so I -- you know,

3  I did read that your physicians aren't employed by the facility,

4  and that's typical.  I understand that.

5          But typically there are nurses, sometimes there's a CNO

6  or you call it something else, you call it the charge nurse, you

7  call it -- I've heard it many different things, but the chief

8  nursing officer, whoever that is.  Hopefully isn't a CNA or a

9  LPN.  You're going to have an RN or a nurse practitioner or

10 somebody with a higher-level degree who could potentially read

11 through the plans or have participated and then answer on behalf

12 of the company why the care plan included X, why did it not

13 include Y?  And, you know, this is stuff that Mr. Mendenhall is

14 going to have to -- either he knows because he's a personal

15 injury lawyer so he has a lot of medical knowledge already or

16 have somebody help him prepare the right kind of questions.

17         But if it's really rooted to, say, you know, how did

18 the company devise -- there's one -- there are two questions I

19 see.  How does -- how does the company devise its care plans?

20 That's a broad corporate representative question.  Doesn't have

21 to be a medical person to say, "This is what we do."

22         "How did you come to the decisions for Mr. Weaver,"

23 that's not going to be the same person.  So that's the level of

24 information that you need so that you know who you're bringing.

25 That's the point, I think, right?

—2:21-cv-00659-RFB-EJY—

1        MS. LEWIS:  Correct, Your Honor.  And I think where

2    we're a little concerned regarding the relevancy as well is --

3    is the fact that, as worded, the profile admission documents,

4    Mr. Weaver was admitted for a whole host of comorbidities.

5    Having somebody prepared to discuss all of that would be very

6    burdensome because he was there for several months, actually

7    longer than that, several years.  And having someone prepared on

8    the breadth of that is concerning.

9        So we can agree to prepare someone for a care plan

10    related to lifts or transfers or -- or evaluation of transfers.

11    Those aspects of things that in relation to his -- I can't

12    standing here think of what his comorbidities were, but,

13    hypothetically diabetes, it's unrelated to the claims at hand.

14    And having someone prepared to address how that impacts the care

15    plan is overly broad in our estimation.

16        THE COURT:  Okay.  Understood.  I will go back and ask

17    Mr. Mendenhall about that.

18        MS. LEWIS:  I think that kind of addresses 2.  16,

19    again, the physician's orders, notes, pharmaceutical orders for

20    Mr. Weaver, Your Honor, those are not at issue in this case.

21    The issue is the fall and the determination as to what type of

22    transfer, what type of sling.  That's all relevant.  All

23    physician orders, notes, pharmaceutical orders is not relevant.

24    And there's also no time period as it relates to this one that

25    would be relevant to the subject incident.

─────2:21-cv-00659-RFB-EJY─────

1          I think that's everything for 16.

2          17, again, Your Honor, as I mentioned kind of in 2, the

3    care plans -- the care plans are broad.  They cover all aspects

4    of Mr. Weaver's care.  And I think that that would need to be

5    more narrowly tailored to what is at issue in this complaint:

6    the lift, the transfer, the evaluation of what type of sling

7    should be used, that aspect of things, but not in relation to

8    hypothetically diabetes or something of that matter.

9          And the -- and this is why I kind of lumped these all

10   together.  The multidisciplinary conference, again, in relation

11   to the subject incident and not in relation to any type of

12   care/treatment he was receiving at the facility.

13         3 --

14         THE COURT:  Is it your position --

15         MS. LEWIS:  Oops.  Sorry, Your Honor.

16         THE COURT:  Just let me ask a quick question.  Is it

17   your position that there's no other aspect of his care that

18   would be relevant, other than transfers by the sling?

19         MS. LEWIS:  Not -- maybe in relation to his general --

20   like his -- that he was an amputee or those aspects of things,

21   but the diabetes and any other comorbidities and what care and

22   treatment was provided in relation to that, I don't think is

23   relevant.  What may be what his overall -- like, this is what

24   his list of comorbidities were, maybe.  But that's also

25   something that's going to be in the medical records and can

——2:21-cv-00659-RFB-EJY——

1  speak for themselves in relation to what exactly Mr. Weaver had.

2  What care and treatment was provided related to that is

3  irrelevant to the claims.

4      THE COURT:  I don't know much about Hoyer lifts.  I

5  understand what it is.  But would it be reasonable in discovery

6  to say when deciding whether to use a Hoyer lift, do you take

7  into consideration, for example, diabetes, uncontrolled high

8  blood pressure, amputation, renal failure, maybe chronic --

9  maybe he has heart failure, which is a chronic condition, maybe

10 he's had a stroke, all of these things, not just what happened

11 that day?

12     MS. LEWIS:  Yes, Your Honor.  I agree that those

13 aspects in evaluating whether he's safe for transfer and what

14 type of transfer needs to be performed and how many people need

15 to perform the transfer, those aspects are relevant.  But

16 whether he received wound care for this or whether he received

17 his medication on this date, that's irrelevant.

18     So his evaluation for the transfer is relevant, but his

19 care and treatment related to those other comorbidities would be

20 irrelevant.

21     THE COURT:  Okay.  All right.  Thank you.

22     MS. LEWIS:  Uh-hmm.

23     THE COURT:  And then you were going to Number 3.

24     MS. LEWIS:  Yes, Your Honor.

25     I think that this one -- trying to recall what ...

—————2:21-cv-00659-RFB-EJY—————

1          THE COURT:  I'm -- I had concerns about witness

2    statements.  I'm not sure what Mr. Mendenhall is seeking, but

3    rather than making him give me each thing today I'm hoping, and

4    I guess it's not the best word for the law, but, nonetheless,

5    with this direction that upon reevaluation and rewording you

6    will have a better picture.  And that together, because it

7    sounds like you all get along reasonably well, that you can

8    figure out together what the subject matters are that he's

9    seeking.  Because the corporate representative can say, "Yes,

10   this is Ms. Smith's witness statement," but I'm not sure what

11   else a corporate -- depending on what's wanted or why it's

12   wanted.  How you go about an investigation?  Maybe.  But I

13   don't -- how you obtain witness statements?

14          MS. LEWIS:  I think -- and that's I think where I'm

15   confused even standing here today, Your Honor, is reading it,

16   it's overbroad to me.  I don't know how to prepare a witness for

17   all of these --

18          THE COURT:  I would say it's vague.

19          MS. LEWIS:  -- aspects of -- vague.

20          THE COURT:  I would say it's vague as opposed to

21   overbroad because I don't know what plaintiff wants.  That's the

22   problem.  That's what I kept writing.  I don't know what it is

23   that plaintiff is seeking about these things.

24          MS. LEWIS:  And as I read it, Your Honor, that was my

25   concern is -- is I don't understand.  I don't know what it's

—2:21-cv-00659-RFB-EJY—

1  specifically looking for.  And when we're talking about

2  post-incident training documents, that would be covered in other

3  topics.  I think it just seemed too intermingled maybe trying to

4  connect all of the things.  I was just confused by this topic.

5  And that, you're right, Your Honor, I think it goes to as it

6  being vague.

7          We objected to 5, "regarding" -- the middle language

8  here, "regarding the care of patients at the facility."

9          THE COURT:  Right.

10          MS. LEWIS:  That is overly broad.

11          THE COURT:  I've already addressed that.

12          MS. LEWIS:  That was -- that was the concern on that

13  one.

14          THE COURT:  Yeah.

15          MS. LEWIS:  So we addressed that.

16          The time period in 6 is what we were concerned about

17  from 2016 or -- I'm sorry -- from, yeah, October of 2016 on both

18  6 and 8 was the time period of --

19          THE COURT:  Right.  So tell me -- because what

20  Mr. Mendenhall explains is he picked the date of admission and a

21  year after the accident.  So why is -- if it is not -- if the

22  purpose is not necessarily to establish negligence, but perhaps

23  to go to product liability, would that change your perspective?

24  And of course then I'll have other counsel address that.  Would

25  that change your perspective on the -- on the time period?

─2:21-cv-00659-RFB-EJY─

1          MS. LEWIS:  Potentially, Your Honor.  I think what our

2  concern is, is the length of time to prepare for all of the

3  training materials that would have been provided, all of the

4  guidance, and -- but as it relates we can -- we can likely

5  prepare somebody.  It would just be burdensome.  And that was

6  what our concern was, the burden of getting someone prepared to

7  discuss all of the trainings for two years prior and a year

8  after, the three years' worth of time for all training to CNAs,

9  to nurses, to any other type of staff that's in the facility in

10  relation to -- because it just says to Hoyer lifts and slings.

11  That's laundry staff.  That's -- that's anybody in relation to

12  that.

13          So that is -- that was why we were saying it's

14  overbroad in time frame because that's also into topic because

15  it's so many different people.

16          THE COURT:  But this says the use of and then the care

17  and maintenance of, right.  So 6 is use of.  8 is care and

18  maintenance of.  Two different -- two different subject matters.

19  I -- wouldn't you want somebody to be able to testify to those

20  things?

21          MS. LEWIS:  Yes, Your Honor.  We do want someone to

22  testify regarding that we have conducted the trainings and have

23  provided knowledge.  We were just objecting to the time frame

24  for being over --

25          THE COURT:  So what time frame would you like to see?

———2:21-cv-00659-RFB-EJY———

1          MS. LEWIS:  We would do a year before the subject

2   incident and six months after.

3          THE COURT:  So give me those dates.

4          MS. LEWIS:  That would be October of 2017?

5          MR. MENDENHALL:  '17.

6          THE COURT:  '17.

7          MS. LEWIS:  '17.

8          MR. MENDENHALL:  A year before the February of 2017

9   through August of 20 -- I don't know.

10          MS. LEWIS:  So they're saying there's five, the

11   February 7th of 2018 to February 7th of 2019?  Is that the --

12          MR. MENDENHALL:  Yeah.

13          MS. LEWIS:  -- same time period?

14          THE COURT:  That's --

15          MR. MENDENHALL:  That's six months before and six

16   months after.

17          MS. LEWIS:  Six months before.  So October -- we would

18   do October of 20 --

19          MR. MENDENHALL:  August of 2018 to February of 20 --

20          MS. LEWIS:  Thank you.  August of 2017 to February of

21   2019.

22          THE COURT:  Think about whether that's okay,

23   Mr. Mendenhall.

24          MR. MENDENHALL:  That's fine.  I'll just say it's fine

25   right now.

2:21-cv-00659-RFB-EJY

1          THE COURT:  Okay.  So you have agreement on that time

2  period.

3          MS. LEWIS:  Okay.

4          (Pause.)

5          MS. LEWIS:  9 is -- is the subsequent remedial measure

6  argument.  It's a standard argument for us regarding what type

7  of training and what type of documents instruction has been

8  performed after the subject incident.  Whether that is

9  admissible at the time of trial, again, Your Honor, plaintiff's

10  counsel has kind of made the discoverability versus

11  admissibility argument.  We understand that.  We just obviously

12  have our concerns in relation to what has -- what the subsequent

13  remedial measure aspect of those questions -- that question.

14          Again, we also kind of find it a little overbroad as it

15  relates to all post-incident training materials, documents.  I

16  don't understand what "documents" means.  I don't understand

17  what "instructions" mean.  And I think that that's where my

18  concerns are in relation to that as well, is it's overly broad

19  and vague into those words.

20          THE COURT:  I understand.

21          MS. LEWIS:  11.

22          THE COURT:  Where's Number 11?

23          MS. LEWIS:  I think we said Number 11 was okay.

24          THE COURT:  Yeah, so I don't see Number 11 on my list.

25          MS. LEWIS:  Okay.

———2:21-cv-00659-RFB-EJY———

1          MR. MENDENHALL:  It's actually listed on page 12 of

2   your initial motion for a protective order.

3          MS. LEWIS:  Yes.

4          THE COURT:  We have Number 10.

5          MS. LEWIS:  Yeah, 10 we -- okay.  Defendant's training

6   and ...

7          Your Honor, I don't think we have any issue in relation

8   to 10 as I stand here.  What our concern was in conjunction with

9   "all slings."  We had represented in our invoices that the only

10  slings that were ordered that were relevant to the subject time

11  period, the only slings that we had, were the Invacare slings.

12  We can have a witness testify to that.

13          THE COURT:  Yes.  That's right.

14          MS. LEWIS:  11 I have marked as okay.

15          So, 15, what our concerns were relate -- was related to

16  the date -- the time periods for the administrative policies --

17  this was 15 and 22 -- was the time period of when -- what

18  policies are we discussing at the subject incident, following,

19  before.  That was my concern there.

20          And also in 15 was the relevancy.  Plaintiff has not

21  made any claims that our staff was -- we were understaffed or

22  that we had inappropriate ratios.  There's been no allegations

23  in the complaint, no allegations to date to address that.  So I

24  think 15 is not proportional to the needs of this case, I mean,

25  because there hasn't been any allegations related to patient

1  ratios.

2          THE COURT:  Okay.

3          MS. LEWIS:  (Pause.)  12 was similar to the last

4  objection, Your Honor, when it says "use of slings," it is

5  overly broad as in relation to all slings when we should be

6  talking about the slings that are relevant to this incident and

7  to what was produced and shown in our possession via invoice for

8  12.

9          20, Your Honor, we had addressed this -- it should have

10  been addressed via written discovery.  I'm not sure if it was or

11  not as I stand here today.  But the quantity, type, size sling,

12  there's a better method to ask those questions.  That's via

13  written discovery.  It was asked via written discovery.  We've

14  produced the invoices as well as Direct Supply has produced the

15  invoices of our requests related to the slings that are within

16  the possession of the facility.  So all of the invoices have

17  been produced.  The quantity, the type, the size has been

18  produced to date.

19          Having a corporate designee simply confirming the

20  invoices seems unduly burdensome.

21          THE COURT:  Well, I don't know that what Mr. Mendenhall

22  is saying, you know, just confirm the invoices, but confirm that

23  they are accurate and that there have been no other Hoyer slings

24  ordered during this time period.  It's two or three questions.

25  I think it's pretty easy for someone.  I don't find that

---2:21-cv-00659-RFB-EJY---

1  burdensome.

2        MS. LEWIS:  Okay.

3        THE COURT:  I think that's the -- the problem here is

4  that what Mr. Mendenhall described he wants to ask is not what

5  it says.

6        MS. LEWIS:  Yes, Your Honor.

7        THE COURT:  So that needs to be addressed.

8        MS. LEWIS:  And I had agreed with that earlier, is what

9  was being requested is also not contained with --

10       THE COURT:  Right.

11       MS. LEWIS:  -- within that --

12       THE COURT:  And that's the same problem with 14 is

13 what's being requested given what the other policy questions are

14 isn't within what I think Mr. Mendenhall is looking for.

15       MS. LEWIS:  Yes, Your Honor.

16       THE COURT:  So that has to be reworded.

17       MS. LEWIS:  Yeah --

18       THE COURT:  And then you can decide if there are other

19 reasons to object, but until you get the reworded subject

20 matters it may be hard to do so.

21       MS. LEWIS:  Yes, Your Honor.  I was not sure that that

22 was asking regarding policies and procedures or what their

23 schedules were.  As it relates to what their schedules were, we

24 can represent what we were told.  In relation to whether they

25 were being honest with that and forthcoming, we can only produce

—2:21-cv-00659-RFB-EJY—

1  what we have.

2          THE COURT:  It's always the case.

3          MS. LEWIS:  Okay.  These are the questions I think that

4  were more directed towards defense, and that was 21 through 25.

5          21, we had objected to all incidents.  That's not in

6  relation to Hoyer lifts and Hoyer slings.  I understand, Your

7  Honor, but that could be a variety of things, maybe falls from

8  Hoyer lifts or -- but this could be someone getting a foot run

9  over.  This could be somebody bumping into a wall.  I mean, it's

10 so broad in relation to incidents --

11          THE COURT:  If it said all patient incidents?

12          MS. LEWIS:  Potentially, but I am thinking of a

13 particular instance where a patient at a separate facility, but

14 a patient's foot had been run over.  I don't know how relevant

15 that is to this.

16          THE COURT:  I know, but until Mr. Mendenhall knows what

17 they are, right, he doesn't know whether it's relevant.  If he

18 brings in front of a jury that a patient's foot was run over, I

19 mean, the jury's eyes are going to glaze over.  You can also do

20 a motion in limine around any incidents that didn't involve a

21 fall or a break of some kind the lift and decide that later.

22 But this is where discovery, in this particular one -- I agree

23 with you in some of them, but in this particular one I think

24 that if you just had all patients -- because if somebody's

25 pulling down a box of slings and gets bumped on the head, okay.

2:21-cv-00659-RFB-EJY

1  That doesn't matter.  But anything involving a patient I think

2  would be reasonable.  So I think that if we just add the word

3  "patient incidents," then you have a limitation there.

4       And should hopefully be very few.  So it shouldn't be

5  hard to prepare somebody.

6       MS. LEWIS:  And I believe, Your Honor, we responded to

7  written discovery.  There are no similar incidents in relation

8  to this, but we can have our --

9       THE COURT:  Good.

10      MS. LEWIS:  -- corporate designee discuss that.

11      Additionally, we had some concerns regarding --

12  regarding this in relation to HIPAA in the sense that what is

13  being requested at the time of deposition.  Are they asking

14  whether something had occurred or the details regarding that?

15  So patient name --

16      THE COURT:  But even the details wouldn't be.  The

17  medical care would be HIPAA, but not the fall, not the break.

18  That's not HIPAA.  If a sling breaks, that's not a medical --

19  it's not covered by the definition of what is medical care.

20  That's not the words HIPAA uses.  So none of that is HIPAA.

21      MR. MENDENHALL:  I --

22      THE COURT:  Medical care would be HIPAA.  You're not

23  going to talk about medical care of other patients, but about

24  incidents involving patients, yes.

25      MS. LEWIS:  I agree with you, Your Honor, as long as

—————2:21-cv-00659-RFB-EJY—————

 1   we're not talking about patient care or response time in

 2   relation to patient care.  Plaintiff has a claim for elder

 3   abuse, and we're afraid that there will be an allegation that

 4   did we respond quick enough.  And that's related to the medical

 5   care, how it was assessed, how the patient -- if there was an

 6   incident, how the patient was addressed, how the care was

 7   provided.  Those aspects of things I believe would be HIPAA

 8   related.

 9         THE COURT:  So you think if somebody -- somebody fell

10   at -- if it's 12:45 and he asks, "So the fall occurred at 12:45.

11   When did the first person above a training of a CNA arrive on

12   the scene," that's HIPAA?

13         MS. LEWIS:  I would think so, Your Honor, because

14   that's a nurse's response time to provide medical care.

15         THE COURT:  I don't think -- how is -- I don't think

16   response time is covered by HIPAA.  You guys can -- you can

17   brief it further, but I just -- I did a lot -- I mean, you know,

18   the big corporations that were doing their own healthcare, we

19   learned a lot about HIPAA in the course of, you know, providing

20   other legal advice.  Just don't see how that is HIPAA related.

21         Yes, did you call -- you know, did you provide an I.V.,

22   did you assess for a -- you know, consciousness, for a

23   concussion, did you assess for broken bones.  I don't know.  I'm

24   making things up here.  That's -- that may be -- not may be.

25   That is medical care, right.  But how long it took you to get

———2:21-cv-00659-RFB-EJY———

1  there?

2          MS. LEWIS:  I would think that the time frame and when

3  the time was provided would be within the medical records of

4  another patient.  That time frame from when a response was

5  provided would be medical care.

6          THE COURT:  Okay.

7          MS. LEWIS:  But it -- if it -- as I've represented, we

8  don't believe anything has happened, Your Honor.  So this is

9  sort of a hypothetical.

10          THE COURT:  Okay.

11          MS. LEWIS:  May be a moot argument.

12          THE COURT:  Okay.

13          MS. LEWIS:  In relation to 23, resident care and safety

14  was our issue.  That is very overbroad, Your Honor, in relation

15  to that could be falls.  That could be wound care.  That could

16  be medication administration.  And so that's what our concern

17  is, is that's just very, very broad when it comes to care and

18  safety.  I --

19          THE COURT:  People could complain about food.

20          MS. LEWIS:  Oh, yes.

21          THE COURT:  So -- so how would you propose to narrow

22  it?

23          MS. LEWIS:  Complaints regarding, maybe, Hoyer lift

24  transfers?

25          THE COURT:  I'm sorry.  What?  Hoyer lift transfers?

──────2:21-cv-00659-RFB-EJY──────

1          MS. LEWIS:  Yes, Your Honor.

2          THE COURT:  That narrow?

3          MS. LEWIS:  Or we could -- we could even say transfers,

4   but I think that that would be more appropriate as opposed to

5   care and safety.  It's just very, very broad.

6          THE COURT:  Okay.

7          MS. LEWIS:  And then as it relates to 24 and 25, those

8   are similar in the sense that the objections are going to be

9   similar.  The council board meetings, this case was removed

10  on -- on diversity and not under a federal question.  And state

11  law protections apply, which would be peer-review privilege.

12  And so our concern there would be what is being sought in these

13  board meeting minutes.  If we're talking about anything that is

14  peer-review protected, that's going to be objectionable at the

15  time of the deposition.

16          And to the full extent that the state law provisions

17  apply, the people involved in the board meeting are arguably

18  protected from any type of disclosure and including their

19  identity.  So I don't know what is being sought in 24 and 25

20  that would not be protected.

21          THE COURT:  Well, if there was a discussion about

22  whether Hoyer lifts should continue to be used or whether there

23  was information out there available to the defendant about

24  accidents pertaining to Hoyer lifts and you selected them any

25  way because they're less expensive than the Boyer lifts or the

 1  Noyer lifts, pick another word, right.  I'm making this up

 2  obviously.

 3          So that might be outside of peer review.  I understand

 4  peer review, and nothing about a 30(b) -- just because you don't

 5  object to a topic doesn't mean you waive the privilege.  So you

 6  are always able to assert privilege.  Now, Mr. Mendenhall might

 7  not agree with you that it's privileged, but that's when you

 8  reserve your rights and you move on.  And you figure out if you

 9  can come to an agreement or you have to come back to the Court.

10  If it's important enough to Mr. Mendenhall and you object, then

11  you come back to the Court.  I can't anticipate those questions.

12          But even if I order a subject matter to go forward,

13  there's nothing about that that suggests or was intended to

14  suggest you waive any privilege.

15          MS. LEWIS:  I understand that, Your Honor.  Our

16  concerns are just -- it skates that very dangerous line of peer

17  review as well as patient safety as it relates to, like Your

18  Honor said, whether the Hoyer lifts are safe or something along

19  those lines.  It could be a safety evaluation and, again, it

20  would be protected.  I just don't -- I guess I don't know what

21  plaintiff is seeking out of these questions.  And that's where

22  our concerns were is preparing someone when we already can

23  anticipate a lot of them will be objectionable.

24          THE COURT:  So patient safety objectionable is

25  objectionable based on HIPAA or on something else?

```
───────────────2:21-cv-00659-RFB-EJY───────────────
```

1          MS. LEWIS:  Patient safety evaluations and meetings

2    with -- I have to remember the -- as I stand here, I have to

3    remember the statute.  But patient safety -- meetings related to

4    the overall patient safety of a committee evaluation of a

5    facility is protected.

6          THE COURT:  By what?

7          MS. LEWIS:  Uhm.  PS -- I don't know if I have it cited

8    in here, Your Honor.  I know it's PSWP ... all right.  I don't

9    have it cited, Your Honor.

10         THE COURT:  Yeah.

11         MS. LEWIS:  We -- and we can bring that objection up at

12   the time of --

13         THE COURT:  What does it stand for?  I'm not -- I know

14   what peer review -- peer review is.

15         MS. LEWIS:  Patient safety work product.  And it's

16   anything that comes out of a patient safety committee or

17   evaluation.  And those cover --

18         THE COURT:  And that's a state --

19         MS. LEWIS:  It's a state protection.

20         THE COURT:  -- it's a state statute.

21         MS. LEWIS:  Yes, Your Honor.

22         THE COURT:  Patient safety protection?

23         MS. LEWIS:  I know it's patient safety work product

24   protections.

25         THE COURT:  I have never heard this before.  Okay.

─────2:21-cv-00659-RFB-EJY─────

1          MS. LEWIS:  And it covers facilities -- any board or

2   committee that is addressing patient safety is covered under it.

3   I don't know the statute in front of me.

4          THE COURT:  See, if you want a judge to consider those

5   things --

6          MR. MENDENHALL:  I know, Your Honor.

7          THE COURT:  -- it would be helpful because I have a

8   pretty broad knowledge base, but not that broad.  I've never

9   heard this.

10          MS. LEWIS:  I know, Your Honor.  I'm very sorry for not

11   citing it.

12          THE COURT:  All right.  Well, I will give

13   Mr. Mendenhall a chance to respond to the patient safety work

14   product protection and whether Nevada law recognizes it.

15   Because there's a lot of debate whether, you know, federal law

16   because Nevada recognizes, for example, an accountant client

17   protection privilege that federal law doesn't recognize.  And

18   that had arguments about whether or not the Federal Courts are

19   bound by that privilege or not bound by that privilege.

20          MS. LEWIS:  And, Your Honor, that's actually why I did

21   not include it in the motion is because there is argument

22   regarding in the courts -- in State Court regarding its

23   applicability and then again with the federal aspect of things

24   with its applicability.  And that's where we would potentially

25   -- if it started to go in that direction, we would be concerned

—2:21-cv-00659-RFB-EJY—

1  and it might need additional motion practice, which is why we

2  were looking just for clarity on those topics.

3          THE COURT:  Okay.  Fair enough.

4          All right.

5          MS. LEWIS:  I think that should address everything on

6  our end.

7          THE COURT:  It did.  Thank you.

8          Sir.

9          MR. VALENCIA:  Yes.  Good afternoon, Your Honor.

10          THE COURT:  Good afternoon.

11          MR. VALENCIA:  Actually, unless you have some questions

12  for me, I don't feel it's fair for me to talk too much.  I mean,

13  this is Mr. Mendenhall's motion.  He noticed the deposition.  Of

14  course, Marquis filed their motion for protective order.

15          I just -- I just would add, this may be helpful, maybe,

16  in some of the back and forth that's been going on about the

17  topics at least as it relates to plaintiff's claims for

18  negligence and negligent training and some of these other things

19  versus the products liability claims which are against my

20  clients.

21          THE COURT:  Right, that's what I thought you were going

22  to address.  Right.

23          MR. VALENCIA:  Yes.  Exactly.  And then of course

24  Marquis has filed some cross-claims against Invacare.  There's a

25  motion that's pending before the Court.  We filed a motion to

—2:21-cv-00659-RFB-EJY—

1  dismiss those cross-claims.

2          But just so that the Court -- and if I'm repeating

3  myself, please stop me if you're aware of this.  As it relates

4  to the lift and the sling, in particular, the sling -- the lift

5  is still being used at Marquis at that facility.  It was

6  inspected and so forth.

7          The sling, in my opinion, is really what's at issue

8  here.  And there were motions that were filed in State Court or

9  a motion filed in State Court for spoliation of evidence.  At

10  the time my understanding was that what happened was plaintiffs

11  had sent a letter asking Marquis to preserve the sling and the

12  lift and the key evidence in this case.  The response came back,

13  "We got rid of it."  And I believe they said they got rid of it

14  right at the time of the incident.  It's gone.

15          My understanding is nobody has come forward yet to

16  testify exactly to what type of sling was used.  The claim is

17  that the sling broke.  I will say these slings are not

18  guaranteed for life.  They wear out.  You need to replace them.

19  You need to take care of them, make sure that they're okay.  We

20  don't have a sling.  So we don't know whether it is an Invacare

21  sling.

22          And my understanding, at least from the attorney that

23  had been handling this before, is there is no evidence -- there

24  is evidence, I should say, that there were different types of

25  slings that were being used at the facility.

—2:21-cv-00659-RFB-EJY—

1        And that --

2        THE COURT:  Do you intend to participate in the

3   30(b)(6) deposition?

4        MR. VALENCIA:  We do, Your Honor.

5        THE COURT:  Are there any subject matters that you --

6   given what you've said, and I understand the importance of what

7   you've said, but of course the motion to dismiss is going to be

8   decided by Judge Boulware, not by me -- that, you know, are

9   there any particular subject matters that you do object to or do

10  you just kind of want to wait and see and you'll raise your

11  objections at the time as appropriate?  You can always reserve

12  objections -- objections, you know, and reserve a right to

13  strike answers and questions because you believe that they're

14  not within the subject matters.  All of those things remain

15  available to everybody.  So that's really my question for you.

16        MR. VALENCIA:  And the short answer is, no, Your Honor,

17  there is nothing in the topics in the notice of deposition from

18  plaintiff that we would right now object to.

19        THE COURT:  Okay.

20        MR. VALENCIA:  But as you point out, Your Honor, once

21  we get into the depo, that may be different.

22        THE COURT:  Right.

23        MR. VALENCIA:  So unless Your Honor has some specific

24  questions for me -- I will say this is why the washing and the

25  care and the laundering of the sling is so important, as well,

—————2:21-cv-00659-RFB-EJY—————

1 because plaintiff's expert recently produced a report that said

2 that when you wash the sling, they think there's something --

3 like, the lettering starts to kind of wear off on the label of

4 the sling.  And it's my understanding that now Marquis is coming

5 forward and saying, "Oh, we got rid of it because on the label

6 it says if it's not in a proper order or whatever, you're

7 supposed to just discard it.  And so we discarded it."

8          So I think all of those issues, we would say, are so

9 far relevant, which is why we have no objection to the --

10 deposing Marquis as to who got rid of it, why they got rid of

11 it, what their policies were, who read the label, so forth and

12 so on.  And so ...

13          THE COURT:  All right.  Understood.  Thank you.  I was

14 just simultaneously looking at the privilege seeing if I could

15 find anything on that quickly.

16          Mr. Mendenhall, couple of things you want to address?

17          MR. MENDENHALL:  Yeah, I mean, we've gone over, I

18 think, most of it, Your Honor.  And you understand the

19 complexities of this case.  One thing I would like to point out,

20 and this goes back to when Ms. Lewis first began talking mostly

21 on, like, Topic 2 and 18.  Defendant Marquis -- and I understand

22 why they're doing this by -- you know, if I try and put myself

23 in their shoes.  They're trying to make this case about an

24 isolated event, right.  Woke up one day, got put in this Hoyer

25 lift, and it broke, and he got injured.

─────2:21-cv-00659-RFB-EJY─────

1          We think that there was a system failure beyond that.

2    She specifically mentioned Number 18 with the multidisciplinary

3    care conferences and not wanting to have to discuss those or

4    anything that's not related, blah, blah -- you know.  I think

5    that's because eight months before he was complaining that these

6    transfers don't go well, especially when there's new CNAs.  He

7    says that, Mr. Weaver, the decedent.  The individual who was

8    conducting the transfer on the date that he fell, it was his

9    third transfer at best, maybe his second.  He wasn't entirely

10   sure.  Second or third transfer, ever, at the facility.

11         That plays into the census that they have an individual

12   who is hired just days before, you know, were they understaffed.

13   These are topics that we need to be able to explore with the

14   corporate designee.  And I keep hearing the word, "Well, this is

15   over -- overly broad or unduly burdensome."  This is not a small

16   arbitration case.  This is a situation where an individual was

17   dropped, broke his femur, had to have his only good leg -- I say

18   good.  It wasn't -- you know, it wasn't good, but he already was

19   a single amputee.  They had to cut his leg off that night at the

20   hospital.  There's several $100,000 in damages.  We have a

21   product liability component to this that is also producing a

22   rigorous defense.

23         These are issues that require a lot of time and

24   exploration.  And, quite frankly, I don't agree with the unduly

25   burdensome, overly broad, these words that are being thrown out

1    when the case is what it is with the complexities that we have

2    with the damages that we've produced.  We have separate and

3    distinct claims form negligence and negligent hiring, training,

4    and supervision, negligent care of an elderly person.

5           These all go into the care that Mr. Weaver was

6    receiving at the facility, not only on the date of the incident,

7    but prior to that.  When we have an individual that was so new

8    to transferring patients with the use of this Hoyer lift, I

9    would really like to discuss what type of training he was

10   receiving particular to that, what type of things he had to pass

11   off, with a corporate designee.

12          I've talked to Mr. Ackom.  I understand it from his

13   point of view, but that's not to say that Marquis can just come

14   in and say, "Well, you have all of the documents.  They all

15   speak for themselves.  So that's all you're going to get from

16   us."

17          THE COURT:  Well, I don't think that's -- I understand

18   what you're saying.  And I don't think that's what Defense

19   counsel was talking about.  So if you look at Number 18, and I'm

20   looking at 17 and 18 because they -- they were -- similar

21   objection was made.  2 was also, but 17 and 18 are a little

22   better examples.

23          If Mr. Weaver was -- I understand his fatality arose

24   from kidney failure, which I suppose could have been exacerbated

25   from the fall.  But knowing what I know about those subject --

1  that subject matter, more than I wish I did, but nonetheless it

2  seems unlikely to me.  And if you were going to ask someone did

3  the care plan take into consideration -- subsequent to the fall

4  how that might interfere with or impact his renal failure, a

5  corporate representative isn't going to be able to answer the

6  question.  That's your problem.

7          So you need to -- if that is what you are looking for,

8  you need to identify it sufficiently so that they can bring in a

9  medical person because the -- because the executive director is

10 not going to be able to answer that question.

11         MR. MENDENHALL:  Sure.  And that's --

12         THE COURT:  But let me just say one other thing --

13         MR. MENDENHALL:  Go ahead.  I apologize.

14         THE COURT:  -- and I don't mean to go on too long.

15 Likewise, more attenuated even, the point that was being made is

16 if -- and I think diabetes is almost a bad example because

17 diabetes is such a systemic problem, such a systemic health

18 problem, it affects everything in a person's body.  But supposed

19 he had cataracts or glaucoma or hearing loss or, you know,

20 arthritis in -- you know, in -- bad arthritis in -- in a digit

21 on his hand and he couldn't use a finger.  Those things wouldn't

22 necessarily have anything to do with the fall or the care that

23 you are interested in.  And so that would be overbroad.  That

24 would be unfair.  And because it's so overbroad, it would be

25 burdensome, unduly burdensome.

—2:21-cv-00659-RFB-EJY—

1          So it depends.  And given that the words are care plans

2    and care plan evaluations with no limitation, what you place on

3    Marquis is the obligation to look at everything that's in these

4    care plans.  And given that this -- the kind of care this man

5    was receiving, where he was, he was already an amputee, I

6    suspect this was not your typical older individual who needed to

7    be in a -- even in long-term facility care, somebody who's just

8    got dementia -- just got dementia, but has dementia but is

9    otherwise physically healthy, right, is going to have a very

10   different set of circumstances than somebody who's already an

11   amputee and in renal failure.  That's going to be a very sick

12   individual.

13          So ...

14          MR. MENDENHALL:  I have two points to address that,

15   Your Honor.

16          THE COURT:  Okay.

17          MR. MENDENHALL:  First, I don't have any intention of

18   asking the corporate designee, "Do you think that his kidney

19   failure played any part in his death."  I understand that that's

20   not their job.  That's not what they're going to be prepared to

21   do.  To the extent that defendant has made that a part of this

22   case by claiming that he wouldn't have required the amputation

23   without his comorbidities, that it was the comorbidities that

24   killed him and not us, they have done that insinuate -- and

25   insinuated those things throughout the case.  But the 30(b)(6)

—————2:21-cv-00659-RFB-EJY—————

1  is not the individual who is going to speak to that.

2         But with the care plans, right, we talked about

3  reducing that down to maybe transfers, right, just the section

4  on transfers.  I should be able to ask the transfers, but also

5  activities.  One of the insinuations that Defense counsel has

6  made is that he was basically a potato who never got out of bed

7  before.  Well, his care plan doesn't say that.  His care plan

8  outlines the activities that he was going to, right.  And so

9  these are things that I should be able to address.

10        And with regard to the transfers, there are changes

11 throughout his time where he was a single transfer, double

12 transfer, back to single.  There was a change made after the

13 incident -- on the date of the incident there was a change made.

14 I should be able to explore what -- I guess what is the

15 procedure or what prompts those changes, why are those changes

16 needed or necessary.

17        So for them to come in and say, "Well, we don't want to

18 talk about it," I mean, the absurdity of that position -- she

19 doesn't even want to talk about Number 3, the subject incident.

20        THE COURT:  Well, what's -- let's just stay focussed

21 for a second on 17 and 18 --

22        MR. MENDENHALL:  Okay.

23        THE COURT:  -- and care just for a second.  And I am

24 not -- those were not -- I know that on 18 that Defense counsel

25 said the subject incident.  I agree with you that's too narrow,

─────2:21-cv-00659-RFB-EJY─────

1  but I also agree all care plans is too broad.  There's somewhere

2  in between.  That's the problem, right.

3         So I agree you get to ask more than what happened that

4  day, what was the care plan the day before, was that care plan

5  followed.  That's a little too narrow, right, obviously.  But,

6  likewise, the care plan on the day that he got there in 2016, if

7  it was '16, October '16, right, might be too broad, especially

8  if it related -- it related to a diabetic meal plan or, like I

9  said, cataracts.  And there's no way for them to know the --

10  what it is they're preparing somebody for without more

11  information.

12         So my comment to you is not -- I'm not even telling you

13  what you can and cannot ask.  And I want to make sure you

14  understand that.  What I'm saying is that as written it's too

15  vague.  It's -- well, vague is vague.  It's like, you know --

16         MR. MENDENHALL:  It doesn't meet the specificity --

17         THE COURT:  -- too unique.

18         MR. MENDENHALL:  -- specificity requirements.

19         THE COURT:  Right.  Too unique.  If it's unique, it's

20  unique, right.  It's vague.  It's just vague.  So you need to

21  provide the specificity.  And then if -- if counsel still

22  objects, you can either -- I can tell you what you can do.  You

23  can just call my chambers, but we'll get there in a second.

24         But until you give them more, right, it's hard to know.

25  And so I am not ruling -- what my ruling is today is what you

—2:21-cv-00659-RFB-EJY—

1  have to do to create that specificity as opposed to telling you

2  that's definitely out kind-of-thing.  I have some comments on a

3  couple of other things, but I don't have the information on

4  Number 1 as you've described it, Number 2 as you've described

5  it, 16, 17, 18 as you've described it.  It's not there for me to

6  rule upon.  So the ruling today is go back and do it again.

7        MR. MENDENHALL:  Thank you, Your Honor.  And I have

8  those listed.

9        THE COURT:  Right, and meet and confer --

10       MR. MENDENHALL:  And I am thoroughly assured, after

11  listening to Ms. Lewis speak, and she can be very persuasive, as

12  we know.  I wanted to make sure that the ruling today wasn't

13  going to be, "Well, we're crossing off all this stuff."

14       THE COURT:  We are not.

15       MR. MENDENHALL:  I have those listed.  I understand the

16  specificity that's needed and the curing that's needed on those.

17  I just wanted to express to this Court and Your Honor the

18  complexity of the case and the gravity of the case with

19  considerable damages, right, just to understand that these

20  things are necessary for us to explore, which after you just

21  spoke, Your Honor -- oh, I'm sorry -- it sounds like you do.

22  And so I just wanted to make sure that that part was heard and

23  it was.  And so I'll rest with that --

24       THE COURT:  And think about --

25       MR. MENDENHALL:  -- Your Honor.  You have a good

1  understanding.

2          THE COURT:  Right.  And think about -- think about

3  requiring -- it's not -- it's hard to be in somebody else's

4  shoes.  I recognize that, but if you think about:  I am going to

5  prepare one or more corporate representatives.  What is enough

6  information so that when I get there, now I'm back in my own

7  shoes, I'm going to have somebody who can answer my questions.

8  Because the last thing you want to do is spend all this time

9  today in court and all the time you're going to spend preparing

10 only to get to the deposition and have Defense counsel say,

11 "That's not what we understood.  We didn't prepare on that.

12 We're going to have to come back," right.

13         And it's going to drag these things out.  Or object to

14 it, right.  To the extent you all can meet and confer and narrow

15 it so that there is sufficient understanding, even if not

16 complete agreement, make your objections, right, then you go

17 forward and you see what you really need and what you get.  And

18 the more specific you are, the more information you're going to

19 get --

20         MR. MENDENHALL:  Understood.

21         THE COURT:  -- because the better prepared the person's

22 going to be.

23         MR. MENDENHALL:  Understood, Your Honor.  Thank you.

24         THE COURT:  All right.  So what we're going to do is,

25 you know, the motion is -- the opposition -- I'm sorry.  I just

---2:21-cv-00659-RFB-EJY---

1   want to give you the ...

2         Okay.  It's ECF Number 41.  And it is granted in part

3   and denied in part to the extent that any subject matter was --

4   that defendants sought to strike -- Defendant Marquis Company

5   sought to strike "any subject matter."

6         Plaintiff is ordered to redraft and provide to Defense

7   counsel a new 30(b)(6) deposition notice that provides the

8   specificity and the subject matters as discussed specifically as

9   to Subjects 1, 2, 16, 17, 18.  I'm adding 3, Mr. Mendenhall,

10  because of the words "witness statement, post-incident training,

11  documents."  It's just too -- just too broad.

12        MR. MENDENHALL:  I had that one listed already, Your

13  Honor.

14        THE COURT:  All right.  And we talked about 5, all

15  training.  That also has to be more specific.  6 and 8, we are

16  narrowing the subject -- the time period.  Did I get it right?

17  August '17 to February of '19?  Is that what was agreed upon?

18        MS. LEWIS:  I think --

19        MR. MENDENHALL:  Oh, I'm sorry.

20        THE COURT:  Yeah, I have it backwards.  You said so

21  many different.

22        MR. MENDENHALL:  It's February 2018 to February 2019.

23        MS. LEWIS:  I think we said one year prior to the

24  incident.  So I think that that would have been August of 2017,

25  and then I think we said six months after, so February of 2019.

—2:21-cv-00659-RFB-EJY—

1          THE COURT:  '19.  That's what I meant.  That's not what
2  I said.

3          MS. LEWIS:  I think that's what we --

4          THE COURT:  That's what I have written down.  I have
5  August of '17 to February of '19 on those subjects.  And then
6  there's no time period on 15 and 22.  Mr. Mendenhall, can we
7  provide -- can we do the time period for those two as well?

8          MR. MENDENHALL:  Yes.  I believe 15 is limited to at
9  the time of the subject incident, meaning that day, but I can be
10  more specific with that, Your Honor.

11          THE COURT:  Okay.

12          MR. MENDENHALL:  22, you're right, does not have a
13  temporal restraint.

14          THE COURT:  Okay.  So we'll add a temporal restraint to
15  Number 22.

16          And I think we've discussed 20 fully.  There appears to
17  be agreement on what's been provided and the subject -- you
18  know, the questions regarding whether there's anything
19  additional will simply have to be answered.

20          14, again, discussed.  It has to be revised.  If you're
21  seeking information about policies and procedures, you will have
22  to revise 14 to state that.  21 is revised to add the word
23  "patients" after the word "all."

24          And May of 2016 is six months before his admission and
25  August 7, '19, is six months after his death.  Is that correct,

—2:21-cv-00659-RFB-EJY—

1  Mr. Mendenhall?

2          MR. MENDENHALL:  Yeah, I think that's a typo, Your

3  Honor, on May.

4          THE COURT:  21 --

5          MR. MENDENHALL:  That should be the October date, the

6  date that he was admitted to the facility, I apologize, on 21.

7          THE COURT:  Okay.

8          MR. MENDENHALL:  And August 7th, 2019, is one year

9  after the incident.

10          THE COURT:  All right.  So that will be the time period

11  that applies to 21, but we've added the word "patient" there.

12          With 23 I think, Ms. -- I'm sorry.  I've forgotten your

13  name.  Ms. Lewis, such a hard name, too.

14          Ms. Lewis makes a good point about patient complaints.

15  You know, people complain -- people complain about food all the

16  time.  They complain they don't like this person.  They complain

17  about the toilet paper.  They complain about all sorts of

18  things.  So that needs to be narrowed and --

19          MR. MENDENHALL:  So we had previously discussed, Your

20  Honor, that I will narrow that to Hoyer lift transfers and

21  slings.

22          THE COURT:  Okay.  And 24 and 25, I do see 42 U.S.C.

23  299b-22.  I have never heard of this statute before, privilege

24  and confidentiality protections.  I do not know enough about

25  this to make any ruling about this today.  I'm going to have to

─────2:21-cv-00659-RFB-EJY─────

1  just leave that to you that any -- any objection based on

2  privilege, if not agreed upon, can be brought back to the Court,

3  and I will rule upon it.  You're just going to have to tell me

4  what the basis is because I just don't have that information

5  now.

6           I think that Ms. -- I would ask you to think about

7  this, Mr. Mendenhall -- that Ms. Lewis's point about patient

8  care is going to be something or peer review is going to be

9  something that is going to be difficult to reach as opposed to

10 administrative decisions regarding Hoyer lifts and the use of

11 Hoyer lifts generally.  So I just will -- based on my brief

12 reading of this statute.  So just you might want to take a look

13 at it, too.  But I'm not -- I'm not crossing them out.  I'm not

14 telling you you can't ask at this point.

15          What I will tell you is that I realize this was not --

16 you know, sometimes orders -- and when I can, I will write an

17 order that says, "You can ask this, you can't ask that, they're

18 specific enough."  This just didn't allow me to do that.  To the

19 extent that -- the transcript will be the order of the Court.

20 But to the extent there are questions, clarification,

21 disagreement as you lead up to the deposition, you can call my

22 chambers.  Tell my courtroom -- my judicial executive what the

23 problem is, without going into great detail.  And then I can

24 either set a telephonic hearing, bring you back in to discuss

25 it, or issue a minute order.  I've done that.  Get you guys on

─────2:21-cv-00659-RFB-EJY─────

 1  the phone and quickly issue a minute order.  I've done that,

 2  too.  I just have enough experience with civil practice to be

 3  able to do that.

 4       It doesn't always work, and I don't have the

 5  familiarity with this subject matter like I do with some.  But

 6  I'm willing to give it a try as opposed to having you have to

 7  write motions and come back in because I think this is more of a

 8  discussion and it really allows for a specific -- you know,

 9  there's just some incidents that allow for easy parameters, and

10  this is just a little different than that.  So I hope --

11       MR. MENDENHALL:  Thank you, Your Honor.

12       THE COURT:  Do you have any questions today?  I'll

13  start with you, Mr. Mendenhall.

14       MR. MENDENHALL:  I don't.

15       THE COURT:  Ms. Lewis, anything from you?

16       MS. LEWIS:  I do, Your Honor.

17       THE COURT:  Okay.

18       MS. LEWIS:  On 15?

19       THE COURT:  Okay.

20       MS. LEWIS:  Regarding the patient census, we had talked

21  about the relevancy of that.  Are -- is your ruling that the

22  question can stay and it just needs to be limited?

23       MS. LEWIS:  The question can stay.  And the time period

24  is at the time of the subject incident, right.

25       MS. LEWIS:  Okay.

2:21-cv-00659-RFB-EJY

1          THE COURT:  Yes.

2          MS. LEWIS:  I think that was my only question.

3          THE COURT:  That's it?  All right.

4          And, Mr. Valencia, any questions or concerns?  No.

5          I know we took a lot of time today.  I appreciate that.

6  Just again, for the record, the transcript of the proceedings is

7  the order of the Court.  And we are adjourned.

8          MS. LEWIS:  Oh, Your Honor.  I'm so very sorry.

9          THE COURT:  Okay.

10          MS. LEWIS:  Before we adjourn, we had discussed prior

11  to -- to the hearing that we anticipate there will probably be

12  three witnesses that we'll need to prepare.  And as our current

13  deadlines are looking -- I think that we had it set for 60 days

14  after the resolution of the hearing.  It's looking based on

15  schedules and based on the holidays and trial that we likely

16  will not be able to get any witnesses together until probably

17  January.

18          Would it be best for us to circulate another

19  stipulation and order to extend once we have identified those

20  days?

21          THE COURT:  What -- what is the discovery cut-off now?

22  Do you know?

23          MS. LEWIS:  Last week.

24          THE COURT:  Yeah.  Well, there you go.

25          Okay.  Hold on one second.  So we are -- the order

1  will -- the transcript will further reflect that discovery is

2  reopened for purposes of allowing the plaintiff to draft a

3  revised 30(b)(6) notice, defendant to prepare for a 30(b)(6)

4  deposition, and for that deposition to take place thereafter for

5  any motion practice, hopefully none, regarding that -- that

6  deposition, any objections, anything that needs to be resolved

7  subsequent, and then for dispositive motions and the joint

8  pretrial order.

9        Of course, until the motion to dismiss is decided, I

10  don't think you will get a trial date.  So you don't have

11  anything to worry about there.  And I am just going to look real

12  quickly at --

13        MR. VALENCIA:  And, Your Honor --

14        THE COURT:  Yes.

15        MR. VALENCIA:  -- in full candor, we are taking

16  depositions beyond -- for some reason November 29th is a

17  deadline that I think stands out in my head as to when we were

18  going to be taking some additional depositions.  There were

19  expert depositions.  There were the 30(b)(6) depositions of

20  Invacare.  We're trying to schedule Direct Supply's 30(b)(6)

21  deposition.  And now we're even looking maybe at possible dates

22  in January for Direct Supply.  We do have one more expert depo

23  in December which is beyond the November 29th date.

24        So there's still discovery that's been going on

25  beyond --

—2:21-cv-00659-RFB-EJY—

1          THE COURT:  Right.  So I have ECF Number 51 in front of

2    me.  The deadline to complete depositions of Dr. Liu,

3    Boelhouwer, Invacare's 30(b)(6), Direct Supply 30(b)(6) are

4    extended in this document to November 29.  And then I think

5    that's really -- it says, "Deadline to file dispositive motions

6    unchanged.  Pretrial order unchanged."

7          So let's extend -- this calendar only goes to December.

8    I got to go to a different screen.  Let's extend discovery here,

9    understanding what happens November -- the U.S. goes crazy.

10   It's kind of like August in France.  The beginning of December

11   is okay, but the end of December is, once again, August in

12   France.

13         So let's extend discovery -- is through January 31

14   sufficient?  Mr. Mendenhall, any objection to that?

15         MR. MENDENHALL:  I believe so.  Further clarification,

16   Your Honor.  We're extending it for the limited purposes of

17   those depositions, correct?

18         THE COURT:  That's correct.

19         MR. MENDENHALL:  Because I think all counsel's in

20   agreement that discovery for other purposes was conducted and

21   concluded.  It was just a matter of scheduling these remaining

22   four, I think, or now with the Marquis depos --

23         MS. LEWIS:  Yeah.

24         THE COURT:  Right.

25         MR. MENDENHALL:  -- making sure that those get done.

2:21-cv-00659-RFB-EJY

1  So as long as it's for that limited purpose, I would agree that

2  that's sufficient, Your Honor, January 31st.

3            THE COURT:  And do you agree, Ms. Lewis?

4            MS. LEWIS:  Yes, Your Honor.  My only question is in

5  relation to the dispositive motions.

6            THE COURT:  I'm going to do those also.  Just give me a

7  second.  I just want to make sure January 31st is sufficient

8  time to get these four rather important and more time-consuming

9  depositions completed.

10           MR. VALENCIA:  I think it is, Your Honor.

11           THE COURT:  All right.  So discovery is reopened to

12  complete deposition discovery as stated in ECF Number 51, plus

13  the 30(b)(6) of Marquis to January 31, 2023.  The dispositive

14  motion deadline is extended to -- do you need -- is February 17.

15  That's about 45 days -- I'm sorry.  That would be 17 days.

16  Sorry.

17           20 -- so to, why don't we say, March 24 for the

18  dispositive motion deadline?  And then the joint pretrial order

19  would be due April 24.  Both the March 24 and April 24 are 2023.

20  And, of course, the April 24 joint pretrial order date is

21  automatically suspended or vacated if dispositive motions are

22  pending on that date.  And the new date becomes 30 days after

23  the Court issues whatever ruling it chooses on those dispositive

24  motions.

25           All right.  So that's our last --

—2:21-cv-00659-RFB-EJY—

1          MS. LEWIS:  Thank you, Your Honor.

2          THE COURT:  -- questions.  Very good.  All right.

3    Thank you, everyone.  We are adjourned.

4          MR. MENDENHALL:  Thank you for your time.

5          MS. LEWIS:  Thank you, Your Honor.

6          (Whereupon the proceedings concluded at 1:18 p.m.)

7                          --oOo--

8        I, Patricia L. Ganci, court-approved transcriber, certify

9    that the foregoing is a correct transcript transcribed from the

10   official electronic sound recording of the proceedings in the

11   above-entitled matter.

12

13    /s/ PATRICIA L. GANCI        NOVEMBER 14, 2022
          Patricia L. Ganci                Date
14

15

16

17

18

19

20

21

22

23

24

25